114 T.C. No. 28

UNITED STATES TAX COURT

PELAEZ AND SONS, INC., CHRISTINA P. HOOKER, TAX
MATTERS PERSON, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 18049-97.                    Filed May 30, 2000.


    Sec. 263A, I.R.C., enacted in 1986, requires the
capitalization of developmental costs.  For plants with
preproduction periods that are 2 years or less, farmers
may be excepted from the capitalization requirements.
For certain plants, including citrus plants grown in
commercial quantities in the United States, the statute
requires that the standard for the 2-year test is to be
based on a national weighted average preproductive
period for that type of plant.  If the preproductive
period, so determined, is 2 years or less, citrus
farmers could be excepted from the capitalization
requirement of sec. 263A, I.R.C.  No guidance had been
issued as to the national weighted average
preproductive period for citrus trees as of 1989, when
P began growing citrus trees.  Due to the lack of
guidance, P did not deduct its developmental costs for
the first 2 years and then determined, based on its
growing experience, that some of its citrus trees were
productive within 2 years.  Based on that experience,

P, in 1991, claimed to be excepted from the
capitalization requirement of sec. 263A, I.R.C., and
deducted the preproductive costs for 1989, 1991, and
1992.  R determined that P was not entitled to deduct
the costs.

Held:  P is not entitled to use its own growing
experience to measure whether it meets the 2 years or
less standard.  Held, further, P must capitalize its
preproductive development costs for its citrus trees.


Philip A. Diamond and Daniel C. Johnson, for petitioner.

Charles A. Baer and James F. Kearney, for respondent.


GERBER, Judge:  Respondent issued a notice of final S

corporation administrative adjustment (FSAA) for Pelaez and Sons,

Inc.'s (corporation), taxable years ended September 30, 1992,

1993, and 1994, reflecting net adjustments in the amounts of

$1,514,209, $46,148, and ($155,814), respectively.  The question

we consider is whether the corporation is required, under the

provisions of section 263A,[1] to capitalize developmental expenses

in connection with citrus trees.  Respondent did not issue

guidance as to the "nationwide weighted average preproductive

period" for citrus trees (the standard in section 263A), and we

must decide whether the corporation's use of its own experience

will suffice to meet the statutory standard.  If, under section

263A, the corporation is required to capitalize, it argues that

---

[1] Unless otherwise indicated, section references are to the
Internal Revenue Code, as amended and in effect for the taxable
periods under consideration.

respondent is precluded from making any adjustment concerning the corporation's 1991 taxable year due to the expiration of the limitation period.

## FINDINGS OF FACT[2]

Pelaez and Sons, Inc., a Florida corporation, was incorporated during 1955 and has continuously had its principal place of business and engaged in commercial farming, through the time of trial, in the State of Florida.  Since 1989, S corporation status has been elected for Federal tax purposes, and the corporation was a cash basis taxpayer for the years under consideration.

Beginning in 1955, the corporation engaged in commercial cattle ranching and during the early 1960's began raising sugar cane.  In the late 1980's the corporation entered into citrus growing operations to increase profits and minimize risk by means of diversification.  After successfully accelerating the reproduction time in its cattle-raising activity, the corporation, in a favorable citrus market, attempted to accelerate the production of citrus crops.  The land to be used for the citrus grove had been used for cattle grazing, which made it most suitable for citrus production.

---

[2] The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

Innovations in citrus growing permitted accelerated growing experiences. Some of the innovations include: Improved irrigation, fertigation systems, higher density planting, virus-free trees, disease control, pesticides, intensive fertilization, and genetic development. Fertigation is a technology that combines fertilization and irrigation to permit continuous fertilizer application and thereby promote more rapid growth. The corporation invested in and employed the above-described technologies. The corporation invested extensively in land preparation, water management, fertilization, and other measures to maximize tree growth and fruit production. Generally, the corporation exploited techniques that would accelerate the growth of its citrus crop and maximize its crop output. The corporation employed Henry Hooker, educated in mechanized agriculture and experienced in fertigation, to assist in its citrus growing activities.

Most citrus trees are grafted trees that consist of two parts, the scion or variety which is grafted or "budded" onto the rootstock, which comprises the tree's root system. In the citrus industry, it is customary to measure a tree's life from the date it is permanently planted, and prior development is disregarded.

During May through July 1989, 39,382 citrus fruit trees (1989 trees) were planted. Eight varieties of citrus were acquired from a commercial nursery and planted by a commercial

planting service under Mr. Hooker's supervision. The parties agree that the costs incurred in establishing the citrus grove, including purchase, bedding, installation of fertigation, and irrigation of the trees are depreciable costs deductible over a period of years.

After the 1989 trees were planted, the corporation incurred certain developmental or cultivation expenses (including herbicides, fertilizer, pesticides, interest, depreciation, and care taking) that were not deducted for the years ended September 30, 1989 or 1990, but they were deducted in later years. The corporation deferred the deduction of the developmental expenses due to a lack of regulatory guidelines and because it was not known whether the citrus grove would produce a marketable crop within 2 years of planting the 1989 trees. At the end of a 2-year productive period, the corporation reviewed the sales of citrus in late 1990 and the potential for a 1991 crop based on the spring blooms and decided to deduct, on its 1991 return, the developmental expenses for the 1989 and 1990 taxable years. The corporation did not deduct the cost of the trees but depreciated them over a rateable period. For 1992 and subsequent taxable years, the corporation deducted the developmental costs (i.e., herbicides, fertilizer, interest, depreciation, and care taking expenses) for the 1989 trees for each year as incurred.

Additional citrus trees were planted during late 1991 (1991 trees), and the planting costs were capitalized and depreciated. Based on the performance of the 1989 trees, it was believed that the 1991 trees would be productive within their first 2 years. The corporation, for its 1992 year and successive years, deducted the developmental expenses and depreciation for the 1991 trees.

Respondent, in the FSAA notice, under section 263A, disallowed the following deductions claimed with respect to the 1989 and 1991 trees:

| Taxable year ended | 1989 trees | 1991 trees |
|---|---|---|
| Sept. 30, 1991 | [1]$1,171,949 | -0- |
| Sept. 30, 1992 | 244,692 | $90,513 |
| Sept. 30, 1993 | -0- | 116,980 |

[1]$649,126.11 of the amount claimed was paid in the 1991 tax year and the remainder in the 1989 and 1990 tax years.

Production History--1989 Trees--The 1989 trees bore blossoms during early 1990, fruit was visible during the spring 1990, and 80 boxes of grapefruit were sold for $220, which was net of the cost of harvest borne by the buyer. The $220 of income was reported on the corporation's 1991 return. The 1989 trees were affected by a 1989 frost, causing a loss of about 50 percent of the grove. The 1989 trees also bloomed in early 1991, and fruit was visible during the spring of 1991. The harvest began in October 1991, and the corporation sold the second crop for approximately $14,600 net of the harvesting costs borne by the buyer.

Production History--1991 Trees--There were blooms on the 1991 trees during early 1993, fruit was visible during the spring 1993, and the corporation sold the fruit from the harvest beginning in October 1993.  Fruit from the 1991 trees won an award, based on size and quality, in a 1993 county fair.

The corporation, for the taxable periods 1991 through 1994, harvested and sold boxes of fruit as follows:

| Taxable year ended | Oranges | Grapefruit | Tangerines/ tangelos |
|---|---|---|---|
| Sept. 30, 1991 | -0- | 80 | -0- |
| Sept. 30, 1992 | 4,465 | 967 | 118 |
| Sept. 30, 1993 | 28,906 | 30,439 | 3,469 |
| Sept. 30, 1994 | 36,242 | 36,836 | 9,413 |

Production information for 1989 trees and 1991 trees was not segregated.

During October 1993, a group described as the "Florida Citrus Liaison Team" was formed, and it consisted of five citrus industry representatives, two tax practitioners, and six representatives from the Internal Revenue Service (IRS).  The IRS' Specialization Program coordinator (for the citrus industry) was a participant in the liaison group.  The group sought guidance from the Office of Chief Counsel of the IRS with respect to issues concerning section 263A.  There was a belief within the liaison group that IRS examiners were not uniformly applying the section 263A provisions.

Albert W. Todd, a C.P.A. with 37 years of experience, prepared the corporation's Federal income tax returns, and he was experienced in agricultural accounting issues.  He had more than one client with exposure to section 263A, and, prior to the time of the filing of the corporation's 1991 return, Mr. Todd concluded that deferral of the decision to deduct the developmental costs was prudent and that the 1989, 1990, and 1991 expenses would be deductible on the 1991 return.  After researching section 263A, Mr. Todd concluded that the U.S. Department of the Treasury had not issued regulations and/or guidance as to the nationwide weighted averages for citrus plants, that no other guidelines existed, and that there was no requirement that taxpayers determine nationwide guidelines.  In that setting, Mr. Todd advised the corporation to make a decision based on its individual experience as to whether section 263A applied.

Pelaez and Sons, Inc.'s, 1991 tax return was mailed on or about January 10, 1992, and was received by the IRS on January 13, 1992.  The notice upon which this case is based was mailed June 2, 1997.  The corporation's 1991 taxable year was closed when the June 2, 1997, notice was mailed.  In calculating the adjustments in the notice, respondent reversed and included in 1992 income the 1991 deduction of $1,171,949 for the 1989 tree developmental expenses.

OPINION

The parties have conflicting interpretations of section 263A. Petitioner argues that the statutory requirement that the standard be based on a national weighted average is invalid and should be disregarded in favor of an approach where each taxpayer's experience should be the measure of whether the section 263A "within 2 years test" is met. Respondent argues that the nationwide average is valid even though no guidance had been issued. Respondent also notes that any guidance that could have been issued would not have supported petitioner's position.

The statute requires taxpayers to capitalize certain direct and indirect expenses or costs. See sec. 263A(a)(1). Section 263A does not apply to "any plant which has a preproductive period of 2 years or less" if produced by the taxpayer in a farming business. Sec. 263A(d)(1)(A)(ii). A "preproductive period" means "in the case of a plant which will have more than 1 crop or yield, the period before the 1st marketable crop or yield from such plant". Sec. 263A(e)(3)(A)(i). For plants grown in commercial quantities in the United States, that crop will be within or without the 2-year period based on "the nationwide weighted average preproductive period for such plant." Sec. 263A(e)(3)(B). Section 263A(i) provides that the "Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section". Section

263A was enacted during 1986, and, through the years in controversy, no regulations[3] or other notification had been issued to provide guidance regarding the nationwide weighted average preproductive period for citrus trees.[4]

In these circumstances, respondent argues that petitioner has failed to show the nationwide average preproductive period for citrus trees and that the corporation should not be entitled to meet the statutory requirement by using its own citrus tree experience. Respondent also argues that congressional intent was to include citrus trees within the capitalization requirements of section 263A; i.e., that Congress knew that the preproductive period for citrus trees was more than 2 years.

Petitioner argues that the corporation is not responsible for determining the nationwide weighted average preproductive period for citrus trees and that it should be allowed to meet the requirements by showing that its actual experience resulted in a

---

[3] Respondent makes the observation that the periodic publication of a list of the national weighted averages for preproductive periods for various plants would, as a matter of practice, have been issued in some form of notice and not be published in the more formal vehicle of a regulation.

[4] No final regulation on this point has been issued. Subsequent to the taxable years under consideration, however, the U.S. Department of the Treasury issued temporary regulations, which included a statement that the U.S. Department of the Treasury intended to publish a list of 37 plants, including orange, grapefruit, and tangerine trees, that were expected to have a preproductive period in excess of 2 years. See T.D. 8729, 1997-2 C.B. 38.

less than 2-year preproductive period.  In essence, petitioner's
argument is that the section 263A(e)(3)(B) nationwide weighted
average requirement has no effect unless respondent issues a
regulation or guidance providing the average.  Petitioner, in the
alternative, argues that any adjustment that is sourced in the
corporation's 1991 tax year is time barred.  The first question
we consider is whether the absence of guidance and/or regulations
changes the statutory requirements.[5]

Petitioner's argument assumes that the only possible source
for a nationwide weighted average is the Commissioner or the
Secretary.  Although the statute requires that regulations be
prescribed as may be necessary or appropriate, the statute does
not specifically mandate that the Secretary calculate the
national averages for various plants.  The statute does require
that the period in question be measured based on the nationwide
weighted average.[6]  Accordingly, if taxpayers were able to show

---

[5] Generally, where regulations have been necessary to
implement a statutory scheme providing favorable taxpayer rules,
this Court has found that the statute's effectiveness is not
conditioned upon the issuance of regulations.  See Estate of
Maddox v. Commissioner, 93 T.C. 228, 233-234 (1989); First
Chicago Corp. v. Commissioner, 88 T.C. 663, 676-677 (1987), affd.
842 F.2d 180 (7th Cir. 1988); Occidental Petroleum Corp. v.
Commissioner, 82 T.C. 819, 829 (1984).  We have held that the
U.S. Department of the Treasury's failure to provide the needed
guidance should not deprive taxpayers of the benefit or relief
Congress intended.  See Hillman v. Commissioner, 114 T.C. 103,
___ (2000) (slip op. at 14).

[6] Congress expected the Secretary periodically to publish
(continued...)

the nationwide weighted average was less than 2 years, they could be excepted from the capitalization requirement of section 263A. In other words, Congress has provided for a standard that is not static and could change from year to year.

Next, we consider respondent's argument that Congress intended that the section 263A capitalization requirement apply to citrus farmers. We first consider the statute to discern congressional intent. See United States v. American Trucking Associations, Inc., 310 U.S. 534, 542-543 (1940); Hospital Corp. of Am. v. Commissioner, 107 T.C. 116, 128 (1996). If the language of the statute is clear, we need look no further in deciding its meaning. See Sullivan v. Stroop, 496 U.S. 478, 482 (1990). If the statute is silent or ambiguous, the legislative history may reveal congressional intent. See Burlington No. R.R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); United States v. American Trucking Associations, Inc., supra at 543-544; Hospital Corp. of Am. v. Commissioner, supra at 129.

Respondent contends that Congress' intent is demonstrated by the language of section 263A(d)(3)(C). That section prohibits farmers from electing out of the section 263A capitalization

---

⁶(...continued)
lists of preproductive periods for various plants. H. Rept. 99-426, at 628 (1985), 1986-3 C.B. (Vol. 2) 1, 628 & n.45. The legislative history, however, is silent on the effect, if any, of the Secretary's failure to so publish the preproductive periods as expected, the very question we consider.

requirement with respect to the costs incurred to develop and maintain a citrus or almond grove for the first 4 years after the trees are planted. We note that growers of plants that produce other than citrus and almonds may elect out of these requirements. Respondent also points out that section 263A(d)(3)(C) is similar to former section 278 and reflects that Congress considered the preproductive period for citrus trees to be more than 2 years.[7]

Subsection (d) of section 263A provides for exceptions from the capitalization requirements for certain farming businesses. As explained above, section 263A(d)(1)(A)(ii) excepts farmers growing plants with a preproductive period of 2 years or less from the section 263A capitalization requirements. Paragraph (3) of subsection (d) permits certain farming businesses to elect out of the section 263A capitalization requirements (i.e., the requirements otherwise applicable to growers of plants with a preproductive period of more than 2 years). One exception from the election out provisions is contained in section 263A(d)(3)(C), as follows:

> SPECIAL RULE FOR CITRUS AND ALMOND GROWERS.--An election under this paragraph shall not apply with respect to any item which is attributable to the planting, cultivation, maintenance, or development of any citrus or almond grove (or part thereof) and which is incurred before the close of the 4th taxable year

---

[7] Sec. 263A(d)(3)(C) and former sec. 278, in effect, contain a 4-year threshold period of mandatory capitalization.

> beginning with the taxable year in which the trees were planted. For purposes of the preceding sentence, the portion of a citrus or almond grove planted in 1 taxable year shall be treated separately from the portion of such grove planted in another taxable year.

Respondent contends that the 4-year limit on the ability of citrus farmers to elect out of section 263A reflects a statutory inference and congressional recognition that citrus farmers were subject to section 263A.[8]

Petitioner argues that section 263A(d)(3)(C) simply provides that the subsection (d)(3) election out of section 263A is not generally available to citrus farmers. Petitioner contends that section 263A(d)(1) defines which farmers are subject to section 263A, whereas section 263A(d)(3) allows certain farmers to elect not to be subject to 263A. In other words, petitioner contends that section 263A(d)(1) should be read separately from section 263A(d)(3). Finally, petitioner contends that respondent's comparison of section 263A(d)(3)(C) to repealed section 278, creates, rather than solves, any ambiguity in section 263A.

We agree with respondent that the inclusion of section 263A(d)(3)(C), as part of section 263A(d), is an indication that Congress intended or expected that the section 263A capitalization rules would apply to citrus farmers (i.e., citrus

---

[8] Respondent also surmises that by setting a 4-year threshold on election out of sec. 263A, Congress was aware that the nationwide weighted average preproductive period for citrus trees would exceed 2 years.

farmers would not meet the "2 years or less" standard).  In general, it would be incongruous to include section 263A(d)(3)(C), if it was expected or intended that citrus farmers would meet the "2 years or less" standard.

Former section 278 provided that expenses, incurred before the close of the fourth year, for planting, cultivation, maintenance, or development of citrus groves, were to be "charged to [the] capital account."  Sec. 278(a).[9]  Section 278 was repealed in connection with the enactment of section 263A in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 803(b)(6), 100 Stat. 2350.  The 4-year limitation on electing out of section 263A comports with a similar 4-year requirement that such expenses were to be charged to the capital account under section 278. Accordingly, for citrus farmers, the requirement that expenses be capitalized, at least for the first 4 years, did not change by repeal of section 278 and the enactment of section 263A.  We are not in a position to say, however, that the 4-year limit in either statute indicates recognition by Congress that the preproductive period for citrus trees was or is 4 years.[10]

---

[9] Sec. 278 was added in 1969 as part of the Tax Reform Act of 1969, Pub. L. 91-172, sec. 216(a), 83 Stat. 615.

[10] In the General Explanation of the Tax Reform Act of 1969, the staff of the Joint Committee on Taxation (J. Comm. Print 1970), explained the reason for enacting the now repealed sec. 278 was to address a situation where certain high-income taxpayers were taking advantage of the benefit of ordinary

(continued...)

The evidence in this case appears to reflect that during the 1989 through 1994 years, the preproductive period for citrus trees was, generally, more than 2 years.  It is evident that in 1989 when the corporation entered into the citrus growing business it employed the latest technological advances.  Employing the most current technology, the corporation produced only limited amounts of citrus from a limited number of its trees within the first 2 years.  We cannot assume that, nationally, other citrus farmers had achieved the same technological state of the art.  It therefore appears possible, if not likely as argued by respondent, that the nationwide average preproduction period for citrus was more than 2 years.

The reports and testimony of the parties' trial experts and the reference sources provided by the parties also demonstrate that the preproductive period for citrus plants was at least 2 years.  A text on Florida citrus growing (received as Exhibit 23-

---

[10](...continued)
deductions currently available against ordinary income and eventual capital gain upon sale of citrus groves.  This benefit had resulted in "unfavorable economic consequences for the citrus industry", in the form of overproduction and depression of prices.  The capitalization requirement specifically addressed that problem by requiring that the expenses be "charged to [the] capital account" at least until the end of the third year after the year of planting (4-year rule).  The legislative history, however, did not contain specific recognition of an established or recognized preproduction period with respect to citrus trees.  Congress, however, may have set the 4-year period to coincide with the then (1969 or 1986) preproduction period for citrus trees.  As evidenced in this case, however, the period may be becoming shorter due to advanced farming technology.

R), in the opening two paragraphs of a chapter on "Bringing

Citrus Trees into Production", contains the following:

> During the first two or three years after planting a
> citrus tree, growers should not seek to obtain the
> earliest possible production of fruit but to develop a
> sturdy tree to good size so that it will bear
> productively over a long life. * * * Growers need to
> aid the growth of the trees only by supplying favorable
> conditions for their development. With no crop to
> consider, growers can devote all attention to promoting
> vegetative growth. Sometimes growers will give minimum
> attention to these young trees because they are not yet
> returning any income, but to neglect them is a mistake
> that will be regretted for a long time because of its
> adverse effect on the trees' future bearing.
> By established custom in Florida, citrus trees are
> classed as nonbearing during the first four years after
> they are planted as yearling trees. Although they may
> bear a few fruits as early as the second or third year,
> all efforts are correctly directed toward tree growth,
> and any fruit production is incidental. * * *
> [Jackson, Bringing Citrus Trees into Production,
> Citrus Growing in Florida, 137 (3d ed. 1991).]

The last paragraph of the same chapter, contains the following

statement:

> Beginning with the fourth or fifth year, when the
> trees are considered of bearing age, practices in grove
> management differ somewhat from those outlined above.
> The following chapters are devoted to the care of
> bearing trees. [Id. at 146.]

Other contemporaneous materials offered by respondent

generally reflect that no meaningful production occurs until the

third year, with full production commencing in the fourth to

sixth year of tree growth. Petitioner's experts highlighted the

fact that the corporation's particular experience demonstrates

that citrus trees are capable of producing some fruit by the end

of the second year. Statistically, however, any such production was incidental and not necessarily representative of an average pattern for preproductive periods. Petitioner's experts also confirmed that the corporation took full advantage of the newest technology. In that regard, one of petitioner's experts opined that technology was to a point where the fourth year standard or convention for citrus development, as had been contained in repealed section 278, was no longer the standard. Petitioner's experts concluded that the corporation's use of advanced technology likely caused the citrus trees to begin producing earlier than would have been experienced under older technology. During the years under consideration, it appears that technology and methodology existed that permitted the possibility of some production within 2 years of "planting".[11]

Similarly, one of respondent's experts opined that a citrus tree needed about 18 months after planting to reach a minimum size to flower and that "Young trees are typically about 24 months old and have reached their second flowering opportunity when small amounts of fruit are produced." Respondent's expert

---

[11] The parties differed in their views concerning when the 2-year preproductive period began. Essentially, petitioner argues for a later starting period, when the farmer plants as opposed to the time when the plant may have been prepared by a commercial nursery for use by farmers. There is no need to decide when the preproductive period begins because the result in this case would be the same no matter which party's belief we follow.

concluded that, industrywide, citrus plants begin their productive life at about 30 to 36 months old. Respondent's other experts concluded that, generally, citrus is ready for harvest in the third year. The experts did not preclude the possibility that production could occur earlier. Accordingly, petitioner's and respondent's experts are relatively close in their views. Their opinions permit the conclusion that citrus trees can produce a small amount of fruit within 2 years, but they vary regarding whether that production is commercially viable within the second year. None of the parties' experts was able to provide empirical or statistical evidence of a "nationwide weighted average preproductive period" for citrus plants.

We can deduce from the election-out provisions applicable exclusively to citrus farmers, that it was expected that citrus tree farmers would not meet the section 263A(d)(1)(A)(ii) 2-year test for being excepted from the section 263A capitalization requirements. To conclude that citrus trees would meet the 2-year test would render section 263A(d)(3)(C) superfluous. In addition, the 4-year limitation on electing-out of section 263A requirements comports with the similar 4-year capitalization requirement in repealed section 278 that, to some extent, section 263A replaced. This supports our holding that Pelaez and Sons, Inc., is subject to the capitalization requirements of section 263A.

Petitioner's argument that the corporation should be allowed to use its individual experience because respondent failed to issue regulations or guidance as to the national weighted average preproduction period for citrus trees is without merit. The plain language of section 263A requires that for a citrus farmer such as petitioner, the preproductive period in the section 263A(d)(1)(A)(ii) exception from section 263A capitalization is measured by means of the nationwide weighted average preproductive period for citrus trees. As indicated above, neither party was able to show that average.

Petitioner also argues that the use of a nationwide average preproduction period for each type of plant is a vague standard or concept and that the statutory standard is vague and should be invalidated. Respondent counters that although no guidance was published by the Secretary or respondent, the standard is not vague. Respondent also explained that the reason that Congress used a nationwide weighted average preproductive period for each type of plant was to ensure that one region of the country did not have an economic advantage over another region because of more favorable growing conditions. So, e.g., if southern farmers enjoy a longer growing season, they may be able to meet the 2-year test and currently deduct their cost of production, whereas northern farmers would not be able to take the current deductions and would be required to capitalize the same expenses or costs.

That is a reasonable explanation for the nationwide average requirement for each type of plant.

Accordingly, the corporation must meet the statute's 2-year threshold based on the nationwide weighted average preproductive period for citrus trees. Though neither the Secretary nor respondent has published guidelines, we are not in a position to hold that the statute is "invalid" as petitioner suggests. In that regard, the terms of the standard are not vague, and there is reasonable justification for the statutory requirement that the exception from section 263A be on a uniform or nationwide basis for each type of crop.

Finally, we consider petitioner's argument that respondent is time barred from making any adjustments to the corporation's income for the years before the Court to prevent duplication of amounts that had been deducted in the corporation's 1991 year, a year that the parties agree is closed. Respondent, admitting that the corporation's 1991 tax year was otherwise closed at the time the notice was mailed, contends that the corporation's 1991 choice no longer to capitalize its production costs constitutes a change of accounting method that triggers section 481(a) and permits adjustments in the 1992 tax year with respect to items deducted in the 1991 year. Accordingly, respondent's ability to make an adjustment in the 1992 year for deductions taken in the 1991 year is solely dependent on whether the corporation's 1991

choice to deduct rather than capitalize the production costs was a change in the accounting method.

Respondent explains that the corporation, under section 263A, had capitalized (not deducted)[12] its citrus grove production costs for its taxable years ended September 30, 1989 and 1990.  Beginning in 1991[13] and in later years, the corporation began deducting its production costs for the 1989 and 1991 trees.  Respondent contends that the corporation changed its method of accounting for costs of citrus production in its 1991 taxable year.  Under respondent's change in the accounting method contention, respondent would be entitled to rely on section 481 to make an adjustment(s) to prevent a distortion of taxable income.  See sec. 481; Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 572 (5th Cir. 1965); W.S. Badcock Corp. v. Commissioner, 59 T.C. 272 (1972), revd. on other grounds 491 F.2d 1226 (5th Cir. 1974).  Under section 481 respondent increases the corporation's 1992 tax year income to adjust for the 1991 tax year deductions

---

[12] Petitioner argues that it did not capitalize the 1989 and 1990 costs for the 1989 trees, but that it deferred deducting them until it could be determined whether they met the 2-year test of sec. 263A(d)(1)(A)(ii).  Petitioner's characterization of the corporation's actions as deferring the deductions as opposed to choosing to capitalize, however, is a distinction without a difference.  In the context of this case and the subject statute, the failure to deduct is necessarily the equivalent of a choice to capitalize.

[13] In 1991, the corporation deducted the costs for its 1989, 1990, and 1991 taxable years.

that should have been capitalized under section 263A. Our holding sustains respondent's position that the corporation must use capitalization principles, beginning in 1992, to account for the expenditures of developing its trees. Unless a section 481 adjustment is made, the amounts already deducted for the 1991 year as development costs of the 1989 and 1991 trees would in effect be deductible a second time, in 1992 and later years, if not through depreciation, then as accumulated costs set off against the proceeds realized from the sale of fruit grown on these trees.

Petitioner does not question respondent's authority to make the adjustment under section 481 but argues that there has not been a change in the accounting method that would make section 481 available to respondent. Without section 481, petitioner contends that respondent is time barred from adjusting the 1992 taxable year. Accordingly, we must decide whether respondent, by requiring the corporation to capitalize such costs under section 263A for 1992 and future years, has changed the corporation's method of accounting for such costs.

Respondent relies on the definition for change of accounting method contained in Rev. Proc. 92-20, 1992-1 C.B. 688, as follows:

> Section 1.446-1(e)(2)(ii)(a) of the regulations provides that a change in method of accounting includes a change in the overall plan of accounting for gross income or deductions, or a change in the treatment of

any material item.  A material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction.  In determining whether a practice involves the proper time for the inclusion of an item in income or the taking of a deduction, the relevant question is generally whether the practice permanently changes the amount of taxable income over the taxpayer's lifetime.  If the practice does not permanently affect the taxpayer's lifetime taxable income, but does or could change the taxable year in which taxable income is reported, it involves timing and is therefore considered a method of accounting.  See Rev. Proc. 91-31, 1991-1 C.B. 566.

Petitioner argues that the corporation was on the cash method of accounting and did not change from that for any year, including 1991.  In addition, petitioner contends that in 1989 and 1990 the corporation intended to defer deducting the costs until such time as it was able to determine whether it met the "2 years or less" test.  In that regard, petitioner argues that exercising the election to deduct or capitalize in section 1.162-12(a), Income Tax Regs., does not constitute a change in the accounting method.  Petitioner, relying on Wilbur v. Commissioner, 43 T.C. 322 (1964), contends that the choice available under the regulation is not a change in the accounting method.  Respondent contends that the holding in Wilbur is contrary to petitioner's interpretation.

Wilbur, which was decided prior to the 1969 enactment of section 278, does not address the question of change of accounting method, and, accordingly does not support either party's argument on that point.  See Wilbur v. Commissioner,

supra, involved an interpretation of section 162 and section 1.162-12(a), Income Tax Regs., concerning a farmer/taxpayer's ability to make or change an election to either deduct or capitalize maintenance expenses in connection with preproductive fruit and nut trees. The regulation was interpreted by this Court to permit a farmer/taxpayer to choose to capitalize some and deduct some expenditures in the same taxable period. Further, it was held that a taxpayer may not be required to capitalize certain expenditures that were inadvertently not included with related expenditures that had been capitalized. See Wilbur v. Commissioner, supra at 326. It was also held that with respect to the expenditures that were capitalized, the election was irrevocable.

In the setting of this case, section 263A governs whether or not the corporation is required to capitalize the costs incurred in connection with the citrus trees. In the context of section 263A, the corporation did not have the choice to capitalize or deduct due to the prohibition contained in section 263A(d)(3)(C). The choice not to deduct was based on the self-conceived predicate that the question of whether the outlays were deductible could not be determined until it was known whether the trees had a preproductive period of 2 years or less under section 263A(d)(1)(A)(ii). As discussed above, the statute did not offer that choice. By not deducting the costs for 1989 and 1990, the

corporation actually complied with the section 263A capitalization requirement. As we have held, Pelaez and Sons, Inc., was not entitled to deduct the 1989, 1990, and 1991 costs on its 1991 return.

There is no doubt that the question of whether to capitalize or deduct the preproduction costs is, in the setting of this case, a timing question and not a one-time inclusion or deduction. Our holding that Pelaez and Sons, Inc., must capitalize rather than deduct such costs beginning with 1992 involves a "material item" so as to constitute a change in the accounting method that would trigger section 481. Accordingly, within the established definition for change in the accounting method, Pelaez and Sons, Inc., as a result of being required to capitalize the preproduction costs beginning in 1992, has changed its accounting method for the deduction of a material item. Such a change warrants respondent's use of section 481 to make the adjustment necessary to prevent a distortion of income.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.